LAURENCE W. BENGTSON'S CASE.

No. 91-P-1124.

Barnstable. October 19, 1992. - March 22, 1993.

Present: ARMSTRONG. JACOBS, & LAURENCE, JJ.

*Workers' Compensation Act*, Injuries to which act applies, Recreational
activities.

The Industrial Accident Reviewing Board, reversing an award of workers'
compensation benefits by an administrative judge in the Department of
Industrial Accidents, properly applied an objective standard in weigh-
ing the voluntariness of the employee's participation on a softball team
organized by his employer, and correctly concluded that the employee
had not sustained his burden of proving that the injury he suffered
while playing on the team was so connected with his employment as to
be compensable under G. L. c. 52, § 26. [243-245]
In view of the numerous common law factors that a trier of fact is to
consider in determining an employee's eligibility for workers' compen-
sation benefits for recreational injury, it was error for an administrative
judge in the Department of Industrial Accidents to conclude that an
employee was eligible for benefits solely on the ground that his partici-
pation in a softball game was not "purely voluntary" under G. L. c.
152, § 1 (7A), as amended by St. 1985, c. 572, § 11. [245-247]

APPEAL from a decision of the Industrial Accident Re-
viewing Board.

The case was reported by *Gillerman*, J.

*John D. Hislop, III*, for the employee.

*Leonard F. Zandrow, Jr.* (*Thomas P. O'Reilly* with him)
for the insurer.

LAURENCE, J. Laurence W. Bengtson injured himself while
playing on a softball team organized by his employer. An
administrative judge awarded Bengtson benefits under the
Workers' Compensation Act, G. L. c. 152, § 26.[1] The judge

---

[1]General Laws c. 152, § 26, provides, in pertinent part, that an em-
ployee eligible for workers' compensation benefits "shall be paid compensa-

concluded that Bengtson's injury was compensable because his softball playing was not the result of "purely voluntary" participation in a recreational activity sponsored by his employer. See G. L. c. 152, § 1(7A).[2]

A reviewing board of the Department of Industrial Accidents reversed the administrative judge's award on the insurer's appeal. The board, accepting the administrative judge's subsidiary findings of fact,[3] nonetheless ruled that the judge had erroneously construed the "purely voluntary" exception to compensability; that there was "insufficient evidence in the record to establish that the employer had pressured Bengtson to play softball"; and that Bengtson had not sustained his burden of proving that his softball injury was so connected with his employment as to be compensable under G. L. c. 152, § 26. We affirm the board's reversal of the administrative judge's award.[4]

---

tion" when he "receives a personal injury arising out of and in the course of his employment."

[2]Statute 1985, c. 572, § 11, codified as G. L. c. 152, § 1(7A), added a definition of "Personal injury" which excluded, and thereby rendered noncompensable, "any injury resulting from an employee's purely voluntary participation in any recreational activity, including but not limited to athletic events, parties, and picnics, even though the employer pays some or all of the cost thereof."

[3]The judge's subsidiary findings were based upon evidence presented by witnesses who appeared before him and therefore had to be accepted by the board as final. Lettich's Case, 403 Mass. 389, 394-395 (1988). The judge's "general" findings, which included his conclusion that Bengtson's participation was not "purely voluntary" but the result of "subtle and compelling coercion" by the employer, were findings based on inferences that the board was free to accept or reject on its reading of the transcript of the hearing. Id. at 395. At the time of the reviewing board's decision (January 8, 1991), the statutory provision governing appeals from a decision of an administrative judge, G. L. c. 152, § 11C, provided that "[t]he reviewing board shall reverse the decision . . . only if it determines on the basis of [the judge's] written opinion and on an examination of a written transcript of the hearing, that the [judge's] decision is beyond the scope of his authority, arbitrary or capricious, contrary to law, or unwarranted by the facts." See St. 1985, c. 572, § 25. This provision was amended, effective December 23, 1991, to restrict the board's power to reverse the administrative judge's decision by eliminating the ground of "unwarranted by the facts." See St. 1991, c. 398, § 31.

[4]Bengtson filed his appeal under G. L. c. 152, § 12(2), from the reviewing board's decision with a single justice of this court in accordance with

Bengtson, then a single, twenty-five year old high school graduate with two years of junior college credits, applied for a job in early March, 1986, with Johnson & Peterson, Inc. (J & P), a South Yarmouth office furniture and supply company. J & P employed twenty-three people, fifteen of whom were male. At the time of his job interview, nothing was said about softball. About a week later, on a Thursday or a Friday, a J & P supervisor called to offer him the job of assembling and delivering office furniture and invited him to come in to meet some of the other personnel before officially beginning work the following Monday.

One of the people Bengtson met when he responded to this invitation was Ernest Johnson, J & P's owner. Johnson told Bengtson that he was organizing a softball team to participate, for the first time, in a Yarmouth men's softball league during the summer. Johnson was trying to determine who was interested in playing in order to complete the forms required by the league. Bengtson, who had been an above-average baseball player in high school and college, expressed his interest in playing.

Eight of the company's male employees ended up regularly playing on the J & P team with Bengtson, including Johnson, who was the driving force on the team, and Peter McGrath, Bengtson's immediate supervisor. Players were provided with T-shirts and caps[5] but had to supply their own gloves and other equipment and their own transportation to games. The softball season began over the Memorial Day weekend. The twenty-six game schedule and league standings were posted on a company bulletin board. Games were played, two or three times a week, at three public fields in the town of Yarmouth, in the evening after work hours.

The J & P team's 1986 season was one of unremitting futility that would have dispirited even hardened Red Sox fans.

---

Rule 2:04 of the Appeals Court (1990). The single justice in turn reported the case upon the certified record from the Department of Industrial Accidents and the briefs to the full panel.

[5]The record does not reveal whether the shirts or caps bore any words, letters or symbols identifying the origin or sponsorship of the team.

Of the scheduled twenty-six games, the team failed to win any, losing several by forfeit because it fielded an insufficient number of players at game time. On other occasions, nonemployees had to be recruited to play in order to avoid a forfeiture. Because of his experience and ability, Bengtson was the best and most valued player on the team. He missed only one game before his injury, which occurred in August when he tore a knee ligament while running out a hit during a makeup game after the regular season had ended.

Although initially anxious to participate because of his love of baseball and competition, Bengtson's enthusiasm waned as the pitiable season wore on. Despite his dissatisfaction, he testified that he "felt obligated" to show up for games in order to prevent forfeitures and in order to "get along" and "fit in" with his fellow employees. Additionally, Bengtson felt "pressure" to participate because his coworkers, as well as Johnson, "would urge" his attendance at games.[6] Bengtson felt particular pressure to continue to play because he did not consider himself a "full time" or "permanent" employee, particularly since he had not been offered any group health insurance after what he believed to be the usual ninety-day waiting period.[7] Finally, Bengtson felt pres-

---

[6]The record is unclear whether this "urging" occurred on just a few occasions or more regularly.

[7]The administrative judge placed great, almost dispositive, significance on the employer's failure to have provided Bengtson with health insurance coverage after three months. That failure, the judge found, reflected the fact that Bengtson was treated differently from all other employees who participated on the softball team, who had the reasonable expectation of being covered by either the employer's health insurance or workers' compensation should they be injured while playing. It is unclear from the record, however, which, if any, of the softball players were provided health insurance by J & P. Bengtson testified that at the time he was hired he was told he would receive such benefits after ninety days; that when he did not receive them he inquired why; and that he was told why by Johnson. Unfortunately, no evidence of what Johnson's explanation was appears on the record. Johnson testified that the company did not automatically offer health insurance to all employees; that employees had to request it; and that only about ten employees actually received it from or through J & P. The record does not indicate which ten they were. Johnson also did not recall ever discussing the subject with Bengtson and stated that all employees were regarded as full-time employees from the start of their employ-

sure to play because he was insecure about his job status. This fact was known to Johnson, who on a couple of occasions had informed Bengtson that he was not satisfied with Bengtson's job performance, although Johnson had also expressed satisfaction with that performance on other unspecified occasions.

When Bengtson missed the only scheduled game he failed to attend, however, no supervisor commented on it, and only one coworker even mentioned it. No one ever told Bengtson (or any other employee) that playing on the softball team was required or a condition of employment. No one ever told him that playing would enhance his job benefits or future. No employee was ever disciplined or disadvantaged for failure to play on the team or to appear for a game. No employee ever received any financial or other incentives to play or rewards for having played.

On the basis of this record, the administrative judge saw "the gravamen of the dispute" as whether Bengtson's participation in the company softball team had been "purely voluntary." The judge determined that it had not been purely voluntary, because he viewed the employer's conduct as constituting "subtle coercion" and "a reasonable compulsion" on Bengtson to participate, emphasizing Bengtson's subjective "perception" that he had to participate in the softball activity in order to remain permanently employed. The administrative judge concluded that a right to compensation automatically follows in such circumstances. Bengtson's entire appeal rests on that conclusion. That is not, however, the law under G. L. c. 152.

No case has yet construed the statutory phrase "purely voluntary participation,"[8] and there appears to be no authori-

---

ment. Presumably, the judge, the final arbiter of credibility, believed Bengtson, not Johnson. The reviewing board on this record did not view the somewhat indeterminate health insurance situation as reflecting a legally significant source of indirect pressure on Bengtson to play softball.

[8]The parties have not pointed to, and our research has not revealed, any similar language in any other jurisdiction's workers' compensation statute, although some have used the term "voluntary participation." See, e.g., Cal. Lab. Code § 3600(a)(9) (Deering 1991).

tative legislative history providing guidance. The parties are in agreement that, by amending § 1(7A) in 1985 to insert the "purely voluntary" provision, the Legislature intended to restrict rather than expand the availability of workers' compensation benefits for recreational injuries. It would appear, given the comprehensive sweep of the unusual modifier "purely" (which, all dictionary definitions agree, connotes unmixed or unqualified), that the restriction was intended to create a relatively limited area of noncompensability for injuries suffered during employee participation in employer-sponsored recreational activities.

Nonetheless, the board was correct in its conclusion that, "to the extent the administrative judge gave weight to the employee's purely subjective perceptions, he was in error." The nature of an employee's participation in a recreational activity under G. L. c. 152, § 1(7A), must be weighed by an objective standard. All of the criteria which the Supreme Judicial Court has established for determining the compensability of employees' recreational injuries are of an objective character. See *Moore's Case*, 330 Mass. 1, 4-5 (1953); *Kemp's Case*, 386 Mass. 730, 733 (1982). Nothing in the 1985 amendment to § 1(7A) suggests an intention to abrogate that existing case law, which we would deem of continued applicability in the absence of explicit language to the contrary. See *Ferullo's Case*, 331 Mass. 635, 637 (1954). Section 1(7A) itself points to the appropriateness of an objective analysis by its reference to the negative criterion of employer subsidization.

No judicial or administrative decision supports the administrative judge's view that the concept of "purely voluntary participation" is to be measured utilizing subjective factors. Indeed, the most analogous precedent rejects it. See *Ezzy* v. *Workers' Compensation Appeals Bd.*, 146 Cal. App. 3d 252, 260 (1983) (under the test for determining whether an employee's recreational participation was "voluntary," pursuant to a State workers' compensation statute which denied any award for "voluntary participation" that was not a reasonable expectancy of the employment [see note 8, *supra*], the

employee cannot recover unless his belief that he was expected to participate is "objectively reasonable"). Cf. Locke, Workmen's Compensation § 246, at 294 (2d ed. 1981) ("Injuries sustained in the course of recreational activities may be compensable, if *on a realistic appraisal of the facts* there appears to be a sufficiently close connection with the employment" [emphasis added]); *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, 410 Mass. 117, 122 (1991) (in construing the word "voluntarily" in the context of an exclusionary clause of a comprehensive general liability policy that released the insurer from a duty to indemnify if the insured "voluntarily" made any payment or assumed any obligations with respect to the covered loss without insurer consent, the Supreme Judicial Court held that the insured's settlement payment was "voluntary . . . because [the insured] had an alternative" course of action which it failed to follow, thereby implicitly adopting an objective rather than a subjective construction of the term "voluntarily"). Finally, construing "voluntariness" under a subjective standard would substantially make the question of participation a matter of individual idiosyncrasy and inevitably broaden recreational injury coverage, in derogation of the conceded legislative intent to restrict it.

Furthermore, even if the administrative judge's conclusion regarding the involuntariness of Bengtson's softball endeavors were upheld, the judge's award would still have to be reversed. As noted above, the 1985 amendment to G. L. c. 152, § 1(7A), did not nullify existing case law with respect to employees injured during recreational activities. Instead, the revised definition of "personal injury" merely clarified and established one of the outer bounds of the subject. "Purely voluntary participation" is noncompensable when injury occurs during the recreational activity and the employer has done nothing more than pay for the costs of that activity. At the opposite end of the spectrum, the cases have stated that actual, express employer compulsion to participate in a recreational activity with resultant injury might itself be determinative of compensability in some situations (none yet adjudicated in Massachusetts). See *Moore's Case*, 330 Mass. at

4-5; *Kemp's Case*, 386 Mass. at 733. The vast gray area in between is left to the trier of fact and "requires an analysis of the facts of each case," *ibid.*, and an "evaluation of the significance of each [relevant] factor found to be present in relation to the enterprise as a whole." *Moore's Case*, 330 Mass. at 5.

Failure to engage in such an analysis and evaluation fatally tainted the administrative judge's effort. His conclusion that Bengtson had sustained the burden of proving an injury sufficiently connected with employment as to be compensable under c. 152 was, as the board found, lacking in evidentiary support. It flowed from a flawed perception of the criteria relevant to resolution of that ultimate issue and reflected a misreading of the applicable law. The authoritative framework of analysis for determining the compensability of employees' recreational injuries appears in *Moore's Case*, 330 Mass. at 4-5.

> '"[The] criteria which may be resorted to in determining whether the employment and the recreation are related with sufficient closeness to warrant an award . . . may be enumerated as follows: (1) The customary nature of the activity. (2) The employer's encouragement or subsidization of the activity. (3) The extent to which the employer managed or directed the recreational enterprise. (4) The presence of substantial pressure or actual compulsion upon the employee to attend and participate. (5) The fact that the employer expects or receives a benefit from the employee's participation in the activity, whether by way of improved employer-employee relationships; through greater efficiency in the performance of the employee's duties; by utilizing the recreation as partial compensation or additional reward for their work, or for advertising the employer's business, or as an actual adjunct of his business. Apart from the existence of employer compulsion, which often might warrant or even require a finding in favor of the employee, the presence or absence of any one of the other factors listed would not necessarily determine the issue. Nor,

indeed, is the foregoing enumeration meant to be exclusive of other factors which might appear in a given case. What is required in each case is an evaluation of the significance of each factor found to be present in relation to the enterprise as a whole. Upon such an evaluation must the decision as to the closeness of the connection between the employment and the recreation ultimately rest." (Citations omitted.)

Accord *Kemp's Case*, 386 Mass. at 733.

The administrative judge's award of benefits solely on the ground of Bengtson's participation not having been "purely voluntary" was incorrect in light of this mandate. The judge erred by treating one factor as outcome determinative rather than weighing all of the relevant criteria in relation to each other and to the particular business circumstances involved.

It was Bengtson's burden to establish that his injury arose out of and in the course of his employment. *Moore's Case*, 330 Mass. at 3. We accept the board's view that the evidence Bengtson submitted and the findings made on that evidence failed to support the administrative judge's conclusions that Bengtson's participation was coerced and his injury compensable under controlling law. The board's reversal of the judge's award was consistent with its authority under G. L. c. 152, § 11C, and Bengtson has presented no valid reason for disturbing the board's exercise of expertise and discretion under G. L. c. 30A, § 14(7). See *Lettich's Case*, 403 Mass. 389, 395-396 (1988). We therefore affirm the decision of the reviewing board.

*So ordered.*